IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**RACHELLE LUCAS**
**ON BEHALF OF M.B.,**

Case No. 1:17 CV 373

Plaintiff,

v.

Magistrate Judge James R. Knepp, II

**COMMISSIONER**
**OF SOCIAL SECURITY,**

Defendant.

MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Rachelle Lucas ("Lucas") filed a Complaint against the Commissioner of Social Security

("Commissioner") on behalf of "M.B" ("Plaintiff"), seeking judicial review of the Commissioner's

decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction

under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of

jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 14). For the reasons

stated below, the undersigned affirms the decision of the Commissioner.

### PROCEDURAL BACKGROUND

Lucas filed an application for SSI on behalf of Plaintiff in September 2012, alleging a

disability onset date of August 30, 2012. (Tr. 10, 303-11). The claim was denied initially and upon

reconsideration. (Tr. 230-32, 233-36). Lucas then requested a hearing before an administrative law

judge ("ALJ"). (Tr. 237). On October 28, 2014[1] and May 12, 2015, Lucas and Plaintiff

---

1. The first hearing was continued to allow Lucas and Plaintiff time to obtain legal representation.
(Tr. 161).

(represented by an attorney) appeared and testified in at a hearing before the ALJ. (Tr. 156-67, 168-209). On September 25, 2015, the ALJ found Plaintiff not disabled in a written decision. (Tr. 10-25). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); 20 C.F.R. §§ 416.1455, 416.1481. Lucas filed the instant action on behalf of Plaintiff on February 23, 2017. (Doc. 1).

FACTUAL BACKGROUND[2]

<u>Personal Background</u>

Plaintiff was born in December 2009 (Tr. 303), making him two years old on the date of his disability application, and five years old on the date of his hearing. (Tr. 156).

Both Plaintiff and Lucas testified at the May 2015 hearing before the ALJ. *See* Tr. 168-209.

Plaintiff testified he was born on December fifteenth lived with "Mommy and Nina". (Tr. 172-73). When asked if he does what they tell him to do, Plaintiff responded: "sometimes". (Tr. 174). Plaintiff testified that he was in preschool, got into "a little bit" of trouble in school, but got along with other children "fine". *Id*. Plaintiff testified he saw his counselor Diane "once a week" and "plays with her a lot". (Tr. 176).

Lucas testified Plaintiff had been in her custody since he was 5 weeks old. (Tr. 180). Lucas is Plaintiff's paternal great-aunt. *Id*. Plaintiff does not have any contact with his biological mother, and minimal contact with his biological father. *Id*.

Lucas detailed the mental and physical difficulties faced by Plaintiff.  She testified that Plaintiff "does not listen at all" to his teachers, Lucas, or Lucas's mother – his paternal great-

---

2. The undersigned summarizes the portions of the record relevant to the arguments raised by Lucas. *See Kennedy v. Comm'r of Soc. Sec*., 87 F. App'x 464, 466 (6th Cir. 2003) (arguments not raised in opening brief considered waived).

grandmother. (Tr. 178). Lucas testified that Plaintiff did not relate well with other children, often separated himself from them, and got into physical altercations over toys. *Id*. She testified Plaintiff had also become physically violent with both herself and her mother. (Tr. 180). Plaintiff saw a psychiatrist, Dr. Shah, "once a month." *Id*. He took daily medications: Adderall in the morning, and Risperdone, Benadryl, and melatonin in the evening. (Tr. 181).

Lucas testified Plaintiff would sleep "four hours tops, but it is broken sleep", and would yell for her or her mother when he woke, suggesting that he was awakened by nightmares. (Tr. 181). She noted Plaintiff had trouble dressing himself and "keeps putting his shoes on the wrong feet". (Tr. 183). Lucas stated Plaintiff "makes a mess" while toileting and "will not sit on the toilet without the little child seat on there". *Id*. She testified Plaintiff is a "picky" eater and mainly ate with his hands. (Tr. 183-84).

Medical Records

A July 2012 developmental summary report from Cuyahoga County Help Me Grow noted concerns with Plaintiff's delays in adaptive functioning and personal-social development. *See* Tr. 461-94. The report noted "no delay" in receptive communication, gross motor skills, and cognitive development. *Id*. The report recommended Plaintiff receive specialized instruction to address behavior issues, as well as occupational therapy to address his "self-regulation issues." (Tr. 461).

In November 2012, Plaintiff underwent an early childhood mental health assessment at Guidestone to address issues with anger and nightmares. *See* Tr. 400-37. Ms. Helen Cuswick, a caseworker, interviewed and assessed Plaintiff. (Tr. 400). Ms. Cuswick noted sensory patterns associated with ADHD. (Tr. 416). She incorporated a mental health status exam into the assessment; it revealed Plaintiff had above average intelligence, but was agitated, withdrawn, and restless. (Tr. 424-425). Ms. Cuswick diagnosed Plaintiff with anxiety state NOS, and disruptive

behavior NOS. (Tr. 435). She assigned a Global Assessment of Functioning ("GAF") score[3] of 47. *Id*.

In January 2013, Plaintiff saw Dr. Nicole Leisgang, Psy.D., for a consultative psychological evaluation. *See* Tr. 600-05. Dr. Leisgang found Plaintiff interacted appropriately with her, was generally in good spirits, and appeared to have considerable energy. (Tr. 602). Dr. Leisgang noted Plaintiff was "playful" but "somewhat difficult to redirect." *Id*. She also found him alert, responsive, and oriented to person and situation, but not fully oriented to time or place. *Id*. Dr. Leisgang noted "[Plaintiff's] general level of intelligence appeared to fall in at least the average range." (Tr. 603). His communication, socialization, and self-help abilities fell within average limits. *Id*. Dr. Leisgang indicated that Plaintiff's responses were not indicative of significant developmental delays, but Plaintiff's grandmother's comments suggested his motor skills were slightly delayed for his age group. *Id*. Dr. Leisgang did not provide any formal diagnosis. (Tr. 605).

In April 2013, Nikhil Koushick, Ph.D, at the Metrohealth Medical Center provided a mental health assessment of Plaintiff. *See* Tr. 611-15. Dr. Koushick diagnosed Plaintiff with disruptive behavior disorder NOS, and provided a rule-out diagnosis of ADHD, anxiety disorder,

---

3. The GAF scale represented a "clinician's judgment" of an individual's symptom severity or level of functioning. Am. Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders,* 32-33 (4th ed., Text Rev. 2000) ("DSM-IV-TR"). "The most recent (5th) edition of the Diagnostic and Statistical Manual of Mental Disorders does not include the GAF scale." *Judy v. Colvin,* 2014 WL 1599562, at *11 (S.D. Ohio); *see also* Am. Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013) ("DSM-V") (noting recommendations "that the GAF be dropped from [DSM–V] for several reasons, including its conceptual lack of clarity ... and questionable psychometrics in routine practice"). However, as set forth in the DSM-IV, a GAF score of 41-50 indicated "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34.

stereotyped movement disorder, and sensory processing disorder. (Tr. 615). Dr. Koushick assigned Plaintiff with a GAF score of 61 to 70, indicating "mild symptoms." (Tr. 616).

Plaintiff's records indicate that his treatment at Guidestone continued beginning in May 2013 with Dr. Aditi Sheth, a psychiatrist. (Tr. 809). During that visit, Dr. Sheth noted concerns of hyperactivity, anxiety, and impulsivity. (Tr. 806). Plaintiff was diagnosed with Asperger's Disorder. *Id*. Dr. Sheth continued to see Plaintiff through a series of follow-up visits from May 2013 to August 2013. (Tr. 792-825). Throughout that time, a diagnosis of Asperger's Disorder was continued, and Plaintiff's GAF score fluctuated between 50 and 55. *See id*. In a July 2013 visit, Dr. Sheth noted Plaintiff was stable, but was walking around the office and pacing, only sitting a few times. (Tr. 803-04). Dr. Sheth increased Plaintiff's Risperdal dosage from 0.25 to 0.5. *Id*.

During a visit in August of 2013, Dr. Sheth noted that Plaintiff was "unable to interact as he is so much in motion." (Tr. 799-800). Dr. Sheth continued with a diagnosis of Autism Spectrum Disorder and assigned a GAF score of 50. *Id*.

In April 2014, Plaintiff's guardian reported to Dr. Sheth that Plaintiff was "not doing well at this time" and his "behavior is all over the place." (Tr. 794). Dr. Sheth increased Plaintiff's Risperdal dosage to 1.5, and added Concerta to take in the mornings *Id*. It was reported to Dr. Sheth in a June 2014 follow-up visit there was no improvement in Plaintiff's behavior on Concerta as he was "still impulsive." (Tr. 792). Dr. Sheth changed Plaintiff's medication to Vyvanse. *Id*.

On December 2, 2014, Dr. Sheth completed a Child Functional Assessment Form (CFAF) for Plaintiff. *See* Tr. 812-13. In it, Dr. Sheth indicated she saw Plaintiff "every few months" for a "couple years". (Tr. 812). Plaintiff's listed diagnosis was "Autism Spectrum Disorder / very limited". *Id*. Dr. Sheth checked the box for "extremely limited" regarding Plaintiff's ability to sustain every listed mental function over a normal day and on an ongoing basis. *Id*.

Dr. Sheth completed another CFAF in June 2015. *See* Tr. 1046-47. Dr. Sheth again checked the boxes indicating Plaintiff was "extremely limited" in his ability to sustain every listed mental function over a normal day and on an ongoing basis. *Id.* Dr. Sheth stated Plaintiff "has been through multiple meds & therapy" and was "still not completely stable". *Id.* She further stated that Plaintiff's family is "very caring" and "he has come a long way but it is a huge struggle." (Tr. 1047).

Plaintiff saw Dr. Alison Flowers, Psy.D., in November 2014 for a consultative psychological evaluation. *See* Tr. 783-90. On examination, Dr. Flowers noted Plaintiff's demeanor and responsiveness were cooperative, but his manner of relating and social skills were poor. (Tr. 786). Dr. Flowers described Plaintiff as "restless and hyperactive", and observed that he "would not sit for any period of time during the evaluation." *Id.* Plaintiff's speech intelligibility ranged from good to fair, and expressive and receptive language appeared age appropriate. *Id.* Plaintiff's thought processes and content were coherent and goal-directed, and his affect was full and appropriate. *Id.* Plaintiff's attention and concentration were "age appropriate" and he was able to count and say the letters of the alphabet. (Tr. 787). Dr. Flowers noted that Plaintiff's "intellectual functioning is estimated in the average range", and that his "general fund of information is age appropriate." *Id.*

Dr. Flowers diagnosed Plaintiff with Autism level II, ADHD, an unspecified anxiety disorder, and a developmental coordination disorder. (Tr. 789). Dr. Flowers noted that "[Plaintiff's] symptoms related to autism may limit his abilities to acquire and use information relative to others his age." *Id.* When asked to describe Plaintiff's abilities and limitations in interacting and relating with others relative to children his age, Dr. Flower's opined:

> The claimant reportedly interacts poorly with others his age. However, this was reported to be improving. He tends to play by himself. There has been one instance

of him being aggressive towards one of his peers. While he answered questions appropriately in the evaluation setting, he was observed to have poor eye contact and at times would lay on the evaluator's floor and make noises, indicating that his interactions were poor.

(Tr. 789-790). Dr. Flowers further noted there were difficulties in activities in daily living such as washing his face independently, pulling his clothes on and off, buttoning and zipping, toileting, and refusing to use a fork and spoon due to sensory issues. (Tr. 790).

<u>Medical Opinion Evidence</u>[4]

On November 29, 2012, at the request of Lucas and Plaintiff's great-grandmother, Sally Reeves, Ph.D., wrote an opinion letter to the Cuyahoga Board of Developmental Disabilities (CCBD), regarding her assessment of Plaintiff. *See* Tr. 580-81. Her assessment was based on information provided by Plaintiff's caregivers, reviewing his medical records, and a brief home observation. (Tr. 580). Based on her personal observation, Dr. Reeves noted Plaintiff "does present as somewhat withdrawn, anxious, fearful child with social awkwardness and sensory issues." (Tr. 581). She found that he "also shows extreme reactivity, and unexplained aggression and anger, with what appears to be some atypical ideation." *Id*. Dr. Reeves concluded Plaintiff showed characteristics of high-functioning Autism Spectrum Disorder. *Id*.

In January 2013, state agency physician Dr. Todd Finnerty, Psy.D., reviewed Plaintiff's records. *See* Tr. 210-218. Dr. Finnerty found no medically determinable impairment "and therefore consideration of symptoms and credibility is not applicable to this claim." (Tr. 214). He offered no diagnosis and "found average cognitive abilities." *Id*.

---

4. Because Plaintiff only challenges the ALJ's determinations regarding the domains of interacting and relating with others, attending and completing tasks, and caring for self, the undersigned only summarizes the medical opinion evidence on these points.

In May 2013, state agency psychologist Dr. Carl Tishler reviewed Plaintiff's records. *See* Tr. 219-28. He concluded Plaintiff had less than marked limitation in interacting and relating with others. (Tr. 224). Specifically, he added that "[Plaintiff] is reported to have difficulty interacting with caregivers, but has been able to interact appropriately with counselors. Will respond to positive reinforcement." *Id*. Dr. Tishler found less than marked limitation in the domain of attending and completing tasks. *Id*. He noted that "[Plaintiff] is able to sit still and focus when he is interested in activity. [Plaintiff] has noted distractibility but was able to be redirected appropriately." *Id*. Finally, in the area of caring for oneself, Dr. Tishler found a less than marked limitation. Dr. Tishler added that Plaintiff "with noted difficulty controlling his behavior. Has frequent tantrums, and has trouble transitioning from task to task." *Id*. In sum, Dr. Tishler concluded Plaintiff's "medically determinable impairment or combination of impairments is severe, but does not meet, medically equal, or functionally equal the listings [. . .]" (Tr. 225).

Educational Records and IEP[5]

The records indicate Plaintiff received special education services under an individualized education plan (IEP). *See* Tr. 116-53. Plaintiff was eligible for special education based on a diagnosis of Autism. (Tr. 573).

On December 3, 2012 Plaintiff underwent an "Evaluation Team" assessment through the Cleveland Municipal School District. *See* Tr. 557-73. Evaluator Natasha Howard, a speech and language pathologist, found that Plaintiff "needs to improve his language skills . . . needs to follow multi-step directions." (Tr. 558). However, she found that Plaintiff "does not require specialized direct instruction in the area of communication in order to improve his receptive language skills",

---

5. Because Plaintiff only challenges the ALJ's determinations regarding the domains of interacting and relating with others, attending and completing tasks, and caring for self, the undersigned only summarizes the educational opinion evidence on these points.

noting "he should continue to gain speech and language skills as he is exposed to typically developing peers . . ." *Id.* Ms. Sharon Eng, an occupational therapist, evaluated Plaintiff's motor skills. (Tr. 559). She opined that his "fine motor skills are age appropriate and should not impede his ability to participate in classroom activities." *Id.* Evaluator Ashley Linnert, a school psychologist, found that Plaintiff "demonstrates difficulty with social interactions, engages in unusual behaviors and stereotypical behaviors, has difficulty tolerating changes in his routine, overreacts to sensory stimulation, and has problems with inattention and/or motor and impulse control." (Tr. 570). Ms. Linnert found that "these behaviors have not impeded his ability to grasp foundational pre-academic skills." *Id.*

In November 2014, Plaintiff's Intervention Specialist, Alicia Glover, of Paul Dunbar School in Cleveland, completed a teacher questionnaire. *See* Tr. 375-82. As the Plaintiff's schoolteacher, Ms. Glover had contact with him nearly six hours per day, five days per week during the school year. (Tr. 375). In the domain of attending and completing tasks, Ms. Glover found "a serious problem" with Plaintiff's ability to refocus on task when necessary, as well as working without distracting himself or others. (Tr. 377). She noted "an obvious problem" with Plaintiff's ability to: pay attention when spoken to directly, organize things, and work at a reasonable pace. *Id.* She found "no problem", or "a slight problem" in the areas of: focusing long enough to finish assignments, ability to follow single and multi-step instructions, waiting, and sustaining attention during playtime. *Id.*

In the domain of interacting and relating with others, Ms. Glover rated Plaintiff as a "1", indicating Plaintiff had "no problem" in each of the activities listed in the evaluation. (Tr. 378). She added: "[Plaintiff] gets along well with his peers. He is beginning to interact more with them during centers [. . .]". *Id.*

Finally, in the domain of caring for himself or others, Ms. Glover generally found "no problem" or "a slight problem" with Plaintiffs abilities. (Tr. 380). The two areas where Plaintiff was noted as having "an obvious problem" or "a serious problem" were in his ability to use appropriate coping skills to meet daily demands, and responding to changes in his mood. *Id*. Ms. Glover added "[Plaintiff] has some sensory concerns and receives occupational therapy. [Plaintiff] is not a behavior problem but he just requires more patience and a 'gentle' touch". *Id*.

In a follow-up questionnaire dated May 21, 2015, Ms. Glover stated that Plaintiff was still in her classroom (which included twelve children—six special needs, and six typical peers—along with two adults). (Tr. 1049). She noted Plaintiff attended school regularly, enjoyed learning, and was able to process information like a typical five year old. (Tr. 1050). Ms. Glover indicated that Plaintiff sometimes requires "extra instruction" for clarity when completing assignments. *Id*. She noted Plaintiff picked at his fingers and lips when he is stressed or anxious. *Id*. Finally, she explained Plaintiff did not handle stress or changes in his environment well, and that he required structure and consistency in his day. (Tr. 1051).

ALJ Hearing Testimony

Medical expert and board certified pediatrician, William Silberberg, M.D., testified at the hearing. (Tr. 185). Dr. Silberberg reviewed Plaintiff's medical and school records, and based his findings on the evidence contained therein. (Tr. 187-90). Dr. Silberberg testified that Plaintiff's impairments included autism spectrum disorder, disruptive behavior disorder, and ADHD. (Tr. 188-189). Dr. Silberberg further testified these impairments did not meet or medically equal the criteria for any listing. *Id*.

Regarding Plaintiff's functioning in each of the six domains, Dr. Silberberg testified that Plaintiff had less than marked limitations in five domains (acquiring and using information;

attending and completing tasks; interacting and relating with others; moving about and manipulating objects; and caring for oneself). (Tr.189-90). Dr. Silberberg found no limitation in the domain of health and physical well-being. *Id*. Dr. Silberberg testified that the evidence, when viewed as a whole, did not support the presence of any marked level limitations. *See* Tr. 193-95.

On cross examination, when asked to explain how he arrived at less than marked limitations, Dr. Silberberg testified that he "like[d] to see the manifestation of these scores in terms of the claimant's behavior, mood, et cetera, academic performance, and so forth. That, I don't see here." (Tr. 198). Dr. Silberberg testified that he was "having difficulty [. . .] going from the diagnoses of these problems to the manifestation of these problems within the school, the home, the society, which demonstrate to me the marked levels which [. . .] are necessary for me to assign the functional equivalence at the marked level." (Tr. 198-99).

ALJ Decision

In a written decision, the ALJ found Plaintiff was born on December 15, 2009, making him a preschool aged child both on the date of application and at the time of the decision. (Tr. 13). Plaintiff had not engaged in any substantial gainful activity since his application date. *Id*. The ALJ found Plaintiff had severe impairments of autism spectrum disorder, disruptive behavior disorder, attention deficit hyperactivity disorder (ADHD), unspecified anxiety disorder, allergic rhinitis and/or asthma, and femoral anteversion and external tibial torsion. *Id*. The ALJ found none of these impairments met or medically equaled the severity of one of the listed impairments. (Tr. 14). Further, the ALJ found that Plaintiff did not have an impairment or combination of impairments that functionally equals the severity of the listings. *Id*.

The ALJ found Plaintiff had less than marked limitation in all six domains (acquiring and using information, attending and completing tasks, interacting and relating with others, moving

about and manipulating objects, ability to care for oneselt, and health and physical well-being). *See* Tr. 19-25. Thus, the ALJ concluded, Plaintiff was not disabled from the date of his application through the date of the decision. (Tr. 25).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). For claimants under the

age of 18, the Commissioner follows a three-step evaluation process—found at 20 C.F.R. § 416.924(a)—to determine if a claimant is disabled:

1. Is claimant engaged in a substantial gainful activity? If so, the claimant is not disabled regardless of their medical condition. If not, the analysis proceeds.

2. Does claimant have a medically determinable, severe impairment, or a combination of impairments that is severe? For an individual under the age of 18, an impairment is not severe if it causes a slight abnormality or a combination of slight abnormalities which causes no more than minimal functional limitations. If there is no such impairment, the claimant is not disabled. If there is, the analysis proceeds.

3. Does the severe impairment meet, medically equal, or functionally equal the criteria of one of the listed impairments? If so, the claimant is disabled. If not, the claimant is not disabled.

To determine whether an impairment or combination of impairments functionally equals a listed impairment, the minor claimant's functioning is assessed in six different functional domains. 20 C.F.R. § 416.926a(b)(1). If the impairment results in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain of functioning, then the impairment is of listing-level severity and therefore functionally equal to the listings. *Id.* § 416.926a(a).

A "marked" limitation is one that is more than moderate but less than extreme, and interferes "seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(2)(i). "It is the equivalent of functioning [one] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *Id*. An "extreme" limitation is one that interferes "very seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(3)(i). The six functionality domains are: 1) acquiring and using information, 2) attending and completing tasks, 3) interacting and relating with others, 4) moving about and manipulating objects, 5) caring for yourself, and 6) health and

physical well-being. *Id.* § 416.926a(b)(1). In determining functional equivalence, the ALJ must consider the "whole child." Social Security Ruling 09–lp, 2009 WL 396031, at *2.

### DISCUSSION

As described above, the Commissioner must find functional equivalence if the impairment results in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain of functioning. 20 C.F.R. § 416.926a(a). Here, the ALJ found Plaintiff had less than marked limitation in each of the six domains. Lucas argues the ALJ erred in these findings, and should have found marked limitation in the domains of: (1) attending and completing tasks; (2) interacting and relating with others; and (3) caring for self. Lucas argues the ALJ unreasonably gave great weight to the findings of medical expert, Dr. Silberberg, and contends his testimony does not provide the necessary substantial evidence to support the ALJ's findings. The Commissioner responds that the ALJ's decision is supported by substantial evidence. For the reasons discussed below, the undersigned affirms the Commissioner's decision.

<u>Functionality Domains</u>

*Attending and Completing Tasks*

First, Lucas argues the ALJ erred in finding than less than marked limitation in the functional domain of attending and completing tasks. The Commissioner responds that the ALJ's decision is supported by substantial evidence and the record does not support a finding that Plaintiff's limitations rose to a marked level.

The domain of "attending and completing tasks" addresses "how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them." 20 C.F.R. § 416.926a(h). For preschool-aged children this means:

> [Y]ou should be able to pay attention when you are spoken to directly, sustain attention to your play and learning activities, and concentrate on activities like putting puzzles together or completing art projects. You should also be able to focus long enough to do many more things by yourself, such as getting your clothes together and dressing yourself, feeding yourself, or putting away your toys. You should usually be able to wait your turn and to change your activity when a caregiver or teacher says it is time to do something else.

*Id.* § 416.926a(h)(2)(iii). Examples of limited functioning in this area (although such examples do not necessarily describe a marked or extreme limitation) include being: 1) "easily startled, distracted, or overreactive to sounds, sights, movements or touch"; 2) "slow to focus on, or fail to complete activities of interest to you, e.g., games or art projects"; 3) easily "sidetracked from your activities or . . . frequently interrupt[ing] others"; 4) "easily frustrated and giv[ing] up on tasks, including ones you are capable of completing"; and 5) "requir[ing] extra supervision to keep you engaged in an activity." *Id.* § 416.926a(h)(3)(i)-(v). Examples of typical functioning in this domain for a preschool-aged child include: 1) paying attention when spoken to directly; 2) sustaining attention to play and learning activities; 3) concentrating on activities like puzzles or art projects; 4) focusing long enough to complete many activities independently (like getting dressed or eating); 5) taking turns and changing activities when told it is time to do something else; and 5) playing contentedly and independently without constant supervision. SSR 09-4p, 2009 WL 396033, *5.

In addressing this domain, the ALJ concluded Plaintiff had less than marked limitation. (Tr. 20-21). The ALJ recognized Plaintiff's difficulties, noting that he "requires ongoing supervision at home and at school", but found the evidence demonstrated a contrast in the way Plaintiff behaves at home, versus in a school setting. (Tr. 20). The ALJ explained:

> During mental health testing at Metrohealth he had to get up frequently from examination tasks to hug his caretaker, but his aunt and grandmother are not present at school, where he exhibits more ability to perform tasks requiring concentration without having such a distraction.
>                                                        * * *

His aunt complained of "meltdowns" and tantrums when switching to the next activity, occurring several times per day, but the Guidestone treatment notes indicated these did not occur at school, and hoped to work with the [sic] Ms. Lucas to implement some of the strategies used by his teachers to reduce tantrums. [citing Tr. 615].

*Id.* The ALJ then explained he gave "great weight" to Dr. Silberg's finding that Plaintiff had less than marked limitation in this domain "as this is consistent with the totality of the evidence." (Tr. 21). This finding is supported by the evidence. *See* Tr. 615 (Guidestone report where evaluator noted "a strong attention seeking component to tantrums . . . when they do not elicit attention from caregivers. Great Aunt and Grandmother are to have the Guidestone worker find out more information about what is being done at school to minimize tantrums to see if this can be replicated at home."); *compare with* Tr. 377 (teacher questionnaire where Ms. Glover rated Plaintiff as having only a "slight problem" in his ability to focus long enough to finish assigned activities or tasks.); see also Tr. 787 (Dr. Flowers' observation that Plaintiff's attention and concentration were "age appropriate").

As noted earlier in his opinion, the ALJ was further persuaded by the teacher questionnaire provided by Plaintiff's intervention specialist, Ms. Glover. (Tr. 17). In assessing her credibility, the ALJ pointed out that Ms. Glover had contact with Plaintiff "daily" since the 2013 school year. *Id.* Her assessment examined daily limitations in attending and completing tasks, but only marked two areas of "serious" limitation: refocusing to task when necessary, and working without distracting others. Tr. 17 (citing Tr. 377). Ms. Glover, however, marked "slight" limitation in nearly all other subject areas of the domain, including the ability to sustain attention during play, focusing long enough to finish assigned activity, completing working accurately, and changing from one activity to another without being disruptive. *Id.* Within the questionnaire, Ms. Glover marked "no problem" in Plaintiff's ability to complete single and multi-step instructions, waiting

to take turns, and completing class assignments. *Id.* The ALJ noted "[t]his teacher questionnaire, considered as a whole, plus all of the other testimony and evidence considered as a whole, persuaded me to put all six domains at 'less than marked'". (Tr. 17).

Additionally, as it relates to Plaintiff's objection that the ALJ gave "great weight" to the opinion of Dr. Silberberg, Dr. Silberberg opined that, while the claimant had "elevated scores as regards to autism, socialization, social reciprocity and emotional reciprocity, and self-regulation . . . the written evidence that I have had an opportunity to review, does not show how these are projected into society in terms of his behaviors." (Tr. 191). As Dr. Silberberg testified, he considered the totality of the evidence in assessing his opinion. (Tr. 195). The ALJ agreed with Dr. Silberberg's assessment, and found that "the weight of the evidence failed to demonstrate the level of actual functional limitation that was suggested by behavioral testing in the school environment." (Tr. 18). An ALJ may rely on medical expert testimony at the hearing and may give the opinions "great" weight. *See Steagall v. Comm'r of Soc. Sec.*, 596 F. App'x 377, 380 (6th Cir. 2015). As Dr. Silberberg testified, his opinion was based upon a thorough review of Plaintiff's medical history and educational records; the ALJ relying upon such an opinion when rendering his decision was not in error. And, as noted above, other record evidence supports his conclusion.

Notably, the ALJ did not find Plaintiff had *no* limitation in this domain, rather, that it was less than marked. And, although Plaintiff can point to evidence suggesting a contrary conclusion, this Court must affirm even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. The undersigned finds the ALJ's decision that Plaintiff had less than marked limitation in this domain is supported by the record, including the opinions of Ms. Glover and Dr. Silberberg.

*Interacting and Relating with Others*

Lucas next argues the ALJ should have found Plaintiff to have marked, rather than less than marked, limitation in interacting and relating with others. The Commissioner responds that the ALJ's determination regarding this domain is supported by substantial evidence.

The domain of interacting and relating with others considers "how well you initiate and sustain emotional connections with others, develop and use the language of your community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." 20 C.F.R. § 416.926a(i). The regulations define the expectations in this domain for preschool-age children (age 3-6) as follows:

> At this age, you should be able to socialize with children as well as adults. You should begin to prefer playmates your own age and start to develop friendships with children who are your age. You should be able to use words instead of actions to express yourself, and also be better able to share, show affection, and offer to help. You should be able to relate to caregivers with increasing independence, choose your own friends, and play cooperatively with other children, one-at-a-time or in a group, without continual adult supervision. You should be able to initiate and participate in conversations, using increasingly complex vocabulary and grammar, and speaking clearly enough that both familiar and unfamiliar listeners can understand what you say most of the time.

20 C.F.R. § 416.926a(i)(2)(iii); *see also* SSR 09-5p, 2009 WL 396026, at *6.

Examples of limited functioning in this domain (although such examples do not necessarily indicate a marked or extreme limitation) include: 1) not reaching out to be picked up and held; 2) having no close friends, or friends are all older or younger; 3) avoiding or withdrawing from people the child knows, or the child is overly anxious or fearful of meeting new people or trying new things; 4) having difficulty with playing games or sports with rules; 5) having difficulty communicating with others; and 6) having difficulty speaking intelligibly or with adequate fluency. 20 C.F.R. § 416.926(a)(i)(3)(i)-(vi); *see also* SSR 09-5p, 2009 WL 396026, at *6-7.

The undersigned finds the ALJ's assessment of a less than marked limitation in this domain supported by substantial evidence. In his opinion, the ALJ recognizes Plaintiff has some social challenges in relating to his peers. (Tr. 22). He further explained, however:

> The evidence fails to demonstrate any significant evidence of disciplinary measures required at the school due to behavioral or interpersonal difficulties. Despite these difficulties, the treatment records indicate the claimant was very cooperative, and even friendly, with most treating sources in his extensive treatment for physical and mental impairments.

*Id.*

Again, this finding is supported by substantial evidence. *See* Tr. 605 ("[Plaintiff] practiced prosocial behavior and did well and used good social skills and manners."); Tr. 786 ("The claimant's demeanor and responsiveness to questions was cooperative."); Tr. 794 ("[Plaintiff] seems well behaved in here and does well for us here.").

The ALJ gave great weight to the opinion of Dr. Silberberg, and Plaintiff's intervention specialist, Ms. Glover (who had contact with Plaintiff on a daily basis). *Id.* In her teacher questionnaire, Ms. Glover rated Plaintiff as a "1" indicating "no problem" in all thirteen categories within the interacting and relating with others domain. *See* Tr. 378. Her marks indicate Plaintiff had "no problem" playing cooperatively with other children, making friends, seeking attention appropriately, expressing anger appropriately, following rules, respecting adults, taking turns, interpreting facial expressions, and using adequate vocabulary and language. *Id.* At the bottom of the questionnaire, Ms. Glover wrote: "[Plaintiff] gets along well with his peers. He is beginning to interact more with them during centers, free time. After a few minutes, [Plaintiff] will go back playing by himself or not wanting to play at all." *Id.* Ms. Glover acknowledged Plaintiff still had some challenges to overcome regarding personal space, noting he "can be very sensitive in regards to personal space" and "gets very upset and will cry, scream and his body tightens up." (Tr. 379).

Despite these challenges, Ms. Glover still rated Plaintiff as having "no problem" in every other area in the domain of interacting and relating with others. *See* Tr. 378-79.

Dr. Silberberg opined Plaintiff had less than marked limitation in this domain after a review of Plaintiff's records. (Tr. 195). Dr. Silberberg recognized Plaintiff had "difficulty in social emotional disease, and problematic behavior." (Tr. 198). However, when examining Plaintiff's challenges, and how they present in his daily life, Dr. Silberberg explained:

> What I'm having difficulty is, is in going from the diagnoses of these problems to the manifestation of these problems within the school, the home, the society, which demonstrate to me the marked levels which I think are necessary for me to assign the functional equivalence at the marked level.

(Tr. 198-99). Additionally, he pointed to the lack of academic disciplinary reports, or police reports, in Plaintiff's file which may also indicate "a manifestation of the diagnosis". (Tr. 199)[6]. The ALJ recognized this lack of disciplinary action, along with the educational and treatment records which indicate "the claimant was very cooperative, and even friendly, with most treating sources in his extensive treatment for physical and mental impairments." *See* Tr. 22. This is supported by substantial evidence in the record. *See* Tr. 605 ("[Plaintiff] practiced prosocial behavior and did well and used good social skills and manners."); Tr. 786 ("The claimant's demeanor and responsiveness to questions was cooperative."); Tr. 794 ("[Plaintiff] seems well

---

6. Although Plaintiff argues Dr. Silberberg created an artificially high standard in referencing police reports, the ALJ reasonably addressed this objection within his decision:

> Ms. Braun argued that Dr. Silberberg based his opinion regarding the domain of interacting and relating with others on the fact that he did not find any police report in the file for this child. If this were the only basis for Dr. Silberberg's opinion on this point, I would agree that the representative's point was well taken. But this is not the only basis for Dr. Silberberg's opinion on this point or, more importantly, my finding on this point. If Dr. Silberberg had not mentioned this point, I have no doubt his opinion would be the same, and my finding would certainly be the same.

(Tr. 18).

behaved in here and does well for us here."); Tr. 378 (noting Plaintiff's progress in relating to and interacting with his peers).

Again, the ALJ did not find Plaintiff had *no* limitation in this domain, rather, that it was less than marked. And, although Plaintiff can point to evidence suggesting a contrary conclusion, this Court must affirm even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones,* 336 F.3d at 477. The ALJ's evaluation of Dr. Silberberg's opinion, combined with his reliance on Ms. Glover's detailed assessment, provide substantial evidence to support the ALJ's determination in this domain. Thus, the undersigned finds the ALJ's conclusion that Plaintiff had less than marked limitation in this domain is supported by substantial evidence.

### Caring for Oneself

Finally*,* Lucas contends the ALJ erred in not finding Plaintiff had a marked limitation in the domain of caring for oneself. The Commissioner responds that the ALJ's determination in this domain is supported by substantial evidence.

The "caring for yourself" domain includes "how well you maintain a healthy emotional and physical state, including how well you get your physical and emotional wants and needs met in appropriate ways; how you cope with stress and changes in your environment; and whether you take care of your own health, possessions, and living area." 20 C.F.R. § 416.926a(k); *see also* SSR 09-7p, 2009 WL 396029. The regulation provides, regarding preschool-aged children:

> You should want to take care of many of your physical needs by yourself (e.g., putting on your shoes, getting a snack), and also want to try doing some things that you cannot do fully (e.g., tying your shoes, climbing on a chair to reach something up high, taking a bath). Early in this age range, it may be easy for you to agree to do what your caregiver asks. Later, that may be difficult for you because you want to do things your way or not at all. These changes usually mean that you are more confident about your ideas and what you are able to do. You should also begin to

understand how to control behaviors that are not good for you (e.g., crossing the street without an adult).

20 C.F.R. § 416.926a(k)(2)(iii). The SSR expands on what constitutes typical functioning in this domain for a preschool-aged child, including: "tries to do things that [s]he is not fully able to do"; "agrees easily and early in this age range to do what caregiver wants, but gradually wants to do many things her own way or not at all"; "develops more confidence in abilities"; and "begins to understand how to control behaviors that are potentially dangerous (for example, crossing street without an adult." SSR 09-7p, 2009 WL 396029, *5.

The SSR also discusses expressing emotional wants and needs. It explains:

Children must learn to recognize and respond appropriately to their feelings in ways that meet their emotional wants and needs; for example, seeking comfort when sad, expressing enthusiasm and joy when glad, and showing anger safely when upset. To be successful as they mature, children must also be able to cope with negative feelings and express positive feelings appropriately. In addition, after experiencing any emotion, children must be able to return to a state of emotional equilibrium. The ability to experience, use, and express emotion is often referred to as self-regulation. Children should demonstrate an increased capacity to self-regulate as they develop.

*Id.* at *3.

Examples of limited function in caring for yourself (although such examples do not necessarily show marked or extreme limitation) include: 1) putting inedible objects in the mouth; 2) using self-soothing activities that show developmental regression (e.g., thumbsucking, re-chewing food) or have stereotyped mannerisms (e.g., body rocking, headbanging); 3) not dressing or bathing self appropriately for age; 4) engaging in self-injurious behavior (e.g. self-inflicted injury or refusal to take medication), or ignoring safety rules; 5) not spontaneously pursuing enjoyable activities or interests; or 6) disturbance in eating or sleeping patterns. 20 C.F.R. § 416.926a(k)(3)(i)-(vi). As examples of children whose impairments affect the ability to regulate their emotional well-being, the SSR provides two examples: 1) "A child with an anxiety disorder

may use denial or escape rather than problem-solving skills to deal with a stressful situation"; and 2) "A child with attention-deficit/hyperactivity disorder who has difficulty completing assignments may express frustration by destroying school materials." SSR 09-7p, 2009 WL 396029, *3.

The ALJ here explained his finding of less than marked limitation in this domain:

The claimant is still reliant on his aunt and grandmother for assistance with many activities of daily living, including toileting, dressing, and brushing his teeth, but he is cooperative and able to do simple self-care functions. The claimant also has some difficulty with confidence in his abilities. Due to his sensory issues, the evidence demonstrated he is a picky eater, and even refuses to use silverware due to the sensation in his mouth. He has difficulty toileting independently due to separation anxiety. He still displays significant fear and lack of confidence for many activities regularly performed by his age-similar peers, such as swinging on a swing, riding a bike, or going down unfamiliar stairs. [citing Tr. 794-96, 803, 809]. A teacher questionnaire indicated the claimant cries and grabs for an adult when he is going up and down stairs. [citing Tr. 1051]. The treating source records from Guidestone also demonstrated some ongoing sleep disturbance with Dr. Sheth noting the claimant averages five hours of sleep per night.

(Tr. 24).

Again, this finding of less than marked limitation is supported by substantial evidence. *See* Tr. 380 (Ms. Glover's findings that plaintiff had "no problem" taking care of personal hygiene, and caring for physical needs (e.g., dressing, eating)); Ms. Glover's finding that "[Plaintiff] is not a behavior problem, but he just requires more patience and 'gentle' touch."); Tr. 602 (Dr. Flowers noting Plaintiff is able to eat with utensils). In support of his opinion, the ALJ gave great weight to Dr. Silberg's opinion, finding that it was consistent with the totality of the evidence on record including the observations of Ms. Glover in this functional domain. (Tr. 24).

As set forth in her detailed analysis of Plaintiff's daily needs, Ms. Glover rated only one area as a "serious problem" within the caring for oneself section – using appropriate coping skills to meet daily demands of school environment. (Tr. 380). And, she found Plaintiff had "an obvious problem" in responding appropriately to changes in his own mood. *Id*. In every other area, Ms.

Glover found either "no problem", or "a slight problem". *Id.* Further, she added that "[Plaintiff] is not a behavior problem, but he just requires more patience and 'gentle' touch." *Id.* Again, the ALJ earlier explained: "[t]his teacher questionnaire, considered as a whole, plus all of the other testimony and evidence considered as a whole, persuaded me to put all six domains at 'less than marked'". (Tr. 17).

Finally, in examining Plaintiff's medical records, the ALJ pointed out:

The claimant's treatment and educational interventions were relatively routine in nature, and demonstrated some improvement in the claimant's functioning. The claimant has not required emergency room care or hospitalization for emotional or behavioral concerns. In general, his treatment has consisted of only outpatient services for counseling and medication management through Guidestone, as well as occupational therapy services for his sensory issues through Metrohealth. [citing Tr. 657-781, 792-810].

The therapy treatment notes indicated some progress toward goals, inconsistent with the current allegations of "marked" or "extreme" functional limitation.

(Tr. 16). The medical record evidence considered as a whole shows that, while Plaintiff clearly had some limitation in the domain of caring for self, there is substantial record evidence to support the ALJ's conclusion that it was less than marked.

The ALJ's analysis was brief in this domain, however, he clearly set forth the sources within the record which he used to arrive at his conclusion. When examining those sources, as discussed above, the undersigned concludes the ALJ did not err in his evaluation of this domain and therefore finds that his decision is supported by substantial evidence.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision to deny SSI supported by substantial evidence. Accordingly the decision of the Commissioner is affirmed.

IT IS SO ORDERED.

 s/James R. Knepp II
United States Magistrate Judge